**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank BELCHER, Jr., Defendant-Appellant.**

**No. 18239.**

United States Court of Appeals,
Seventh Circuit.

Sept. 14, 1971.

William J. Bauer, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, and KERNER and PELL, Circuit Judges.

PELL, Circuit Judge.

The defendant, Frank Belcher, Jr.,[1] was indicted on June 24, 1969, in three counts charging violations of 18 U.S.C. § 659 and in a fourth count charging a conspiracy so to do. A jury found him guilty of the conspiracy (Count I) and on Counts III and IV. From the conviction and sentence thereon, Belcher appealed.

At the pertinent times, Belcher was a truck driver for Hires Trucking Company. During the same periods of time, one James P. Claffy[2] was a loader at Acme Fast Freight, a forwarding company and subcontractor for Norfolk and Western Railway. The Acme dock here involved was on the railway property in Chicago.

In March of 1968,[3] Claffy inadvertently loaded onto Belcher's truck, merchandise which did not belong there and which inadvertence was not noticed at the time. The next day Claffy asked the defendant about the item and ultimately Belcher told Claffy he had sold it. A few weeks after that while Claffy was putting freight on Belcher's trailer, the defendant pointed out two cartons, said they were very valuable and if Claffy loaded them it would be worth something to Claffy. Claffy loaded them. The following day Belcher gave Claffy $100. After that Claffy saw the defendant two or three times a week and on these oc-

Anna R. Lavin, Chicago, Ill., for defendant-appellant; John J. Cogan, Chicago, Ill., of counsel.

1. The defendant's real name was as given in the indictment. However, he was known to all persons involved in the activity which is the subject of the litigation as James J. Burke and he was identified in the testimony as Burke. For convenience of reference herein, however, we will use his correct name.

2. Claffy was not indicted with Belcher but was separately indicted for a violation of 18 U.S.C. § 659 based on the same factual situation involved in Count IV of the Belcher indictment with the exception that Claffy was charged with a misdemeanor and Belcher with a felony. Claffy had entered a plea of guilty to the indictment but had not been sentenced at the time of Belcher's trial, during which Claffy was probably the principal witness against Belcher.

3. Count I of the indictment charged the beginning date of the conspiracy as March 1, 1968.

casions after loading the authorized pickup, Claffy would throw on other freight which was not supposed to be put on his truck. Claffy received from $20 to $100 for each load from Belcher, until during one week in July, 1968, Claffy received as much as $550. The additional loadings on Belcher's truck by Claffy continued intermittently until May, 1969.

As of May 19, 1969, and for approximately six weeks prior to that day, railroad police had been conducting a surveillance every time they were aware that Belcher had come to the dock. On May 19, at about 3 p. m., Belcher asked Claffy if there was anything out on the dock and Claffy told him that it was too early, that there were too many people around and that he could not do anything. Belcher told Claffy he had another pickup and would be back later. At approximately 4:30 p. m., Claffy again saw defendant at the Acme yard. In response to Belcher's question whether Claffy could get something for him, Claffy said he could. Belcher then went outside. At about this time, two of the railroad policemen commenced surveillance at a point approximately 130 feet from where the Hires truck was backed to the loading dock at section 23. They observed Claffy go to section 19 of the dock, secure a hand cart with which he proceeded to section 25 where he loaded television sets and radios onto the cart. These were taken to section 23. Claffy then went to section 24 and loaded two other cartons on a cart and brought them to section 23. He then raised the rear overhead door on the Hires truck and placed all the items onto the truck. When finished, he lowered the rear door of the truck, closed the door to section 23 and walked toward the office.

The two policemen went out in the area of the truck and asked Belcher if he was the driver of the truck. He said he was. One of the officers asked Belcher to turn the motor off, that they wanted to look inside. Belcher said, "Okay." They looked inside and there discovered the merchandise which was the subject of Counts III and IV. Belcher said,

"How did this stuff get on my truck? That is not my freight. I don't know how it got there." There is some indication in the record that at some point he also stated that he was being framed.

Later one of the officers asked Belcher if he had bills for the freight that was on the truck. He had bills for some of the items but did not have bills for the items which were subsequently made the subject matter of Counts III and IV of the indictment, being boxes of underwear and television sets.

It is not entirely clear from the record whether Belcher in fact did make any other pickup from Acme on the day in question. In the hearing on the motion to suppress, one of the police officers, Leird, testified that he had been told by one Teske, who was an employee of Acme, that Belcher had no pickups that day. At one point in his testimony Leird testified that Belcher did not have bills for the freight that Claffy had put on the truck. At another point, he testified that Belcher produced bills for everything that was on the truck except the TVs and the underwear. Thus it is not clear whether Belcher did or did not have bills for the shirts which Claffy also put on the truck, which were the subject of Count II as to which the jury returned the not guilty verdict. Further, it was stipulated that a dispatcher with Hires Trucking Company, if called as a witness, would testify that he had received a phone call requesting him to send a driver to Acme on May 19, 1969, and that Belcher was dispatched for the pickup. The identity of the caller was not stipulated.

The practice was that the dock closed at 4:30 for pickups and the incidents in question happened about 4:45 or 4:50. At the time the police officers came to the truck, the motor was running.

Belcher's first contention on this appeal is that his motion to suppress should have been granted as there was an illegal search and seizure in violation of Belcher's fourth amendment rights.

No doubt the founding fathers, if they had been informed that a person's right to be secure in person, house, papers and effects against unreasonable searches and seizures extended to this factual situation, would have been astonished. The merchandise here involved was in the hands of a common carrier in interstate commerce. The carrier had the duty of seeing that the merchandise was delivered to the consignees and, *inter alia,* employed police to see that that purpose was accomplished. Belcher brought not his own personal vehicle but a corporation truck, as to which he was merely the driver, onto the railroad property for the purpose of taking deliveries only of merchandise on which he had freight bills. Arguably there perhaps should be some privilege on the part of the carrier while the pickup truck is still on its premises to see by way of routine inspection that incorrect merchandise has not been loaded.

Our attention, however, has not been directed to any authority for excepting Belcher in this particular factual situation from the full benefit of the fourth amendment rights and we therefore proceed on the basis of his having full rights.

 The Government's first contention is that the district court's ruling was proper because the conduct of the railroad security men was not "governmental action," and thus the fourth amendment is inapplicable, citing Burdeau v. McDowell, 256 U.S. 465, 475, 476, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), and 3 Wright, Federal Practice & Procedure, Criminal § 661 (1969). Thus, in effect they are saying that the men in question were private persons and therefore the overthrow of the Silver Platter doctrine (Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)) does not apply here.

We cannot accept this contention. The men in question both indicated they were railroad policemen, that they carried guns and had the power to arrest. It seems clear they had authority as police officers under the Illinois Statutes, Ill. Rev.Stat. ch. 114, § 98 (1969).

 The Government also contends, however, that probable cause existed here and that under the particular circumstances the seizure was imperative and proper. We agree.

The Supreme Court has long recognized that for purposes of the fourth amendment there is a constitutional difference between houses and motor vehicles. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *see* cases cited in Chambers v. Maroney, 399 U.S. 42, 49–50, 90 S.Ct. 1975, 26 L. Ed.2d 419 (1970). Thus a warrantless search of a motor vehicle is valid in circumstances that would not justify a search without a warrant of a house or office, provided that there is probable cause to believe that the vehicle contains articles that the officers are entitled to seize. Chambers v. Maroney, *supra,* 399 U.S. at 46–52, 90 S.Ct. 1975. Probable cause exists where the facts and circumstances within the officers' knowledge, and of which they had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been, or is being, committed. Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

Because of evidentiary rules we do not have the benefit, as people do in the daily conduct of their affairs, of knowing the basis for the surveillance of Belcher and Claffy. We do know, however, that Belcher had been under surveillance whenever it was known that he was at the premises for some six weeks and that the particular surveillance in question immediately followed a conversation with Acme employee, Teske. The time was after normal operating hours and subjectively the officers had reasonable grounds for believing that Belcher had no legitimate pickup at the Acme dock. The motor on the truck was running and obviously there was no time to secure a warrant.

While we give it no weight in deciding the present issue, nevertheless, the testimony of one Joe Sagami is illustrative of the need for haste in a factual situation of this sort. Sagami owned a warehouse and in November, 1968, Belcher picked up a shipment. Sagami saw furniture go on the truck. Belcher's truck pulled away from the dock. Thereafter Sagami went to his office and looked for signed bills of lading for the furniture and found none. He called Hires Trucking and found where the next delivery was to be made and got in his automobile and went there. About eight minutes after he arrived, Belcher came in the truck. He denied he had any furniture and the truck did not contain the furniture. The next day Belcher told Sagami he was sorry about what happened and eventually he made restitution to Sagami for the furniture.

The surveilling officers were concealed and there is no indication that Claffy was aware that he was being watched at the time he was loading the truck.

In the brief on this appeal, Belcher contends that the informant to Leird of no pickups was unidentified and unsponsored. However, as we read the record, Leird testified specifically that he had been notified that there would be no pickups by Mr. Teske. No question was raised at the time of the motion to suppress or in the trial as to this being an unreliable source nor as Belcher now contends "anonymous hearsay." This issue seems to be raised for the first time on appeal. As we have already indicated, the record shows that Teske was at the time an employee of Acme at the particular dock in question.

However, in our opinion, this information merely strengthens the probable cause and even without it there was under the particular factual circumstances here involved probable cause for the search that was made.

On this appeal, the defendant emphasizes that the statement of both officers was that he was asked to turn off his motor, "that we would like to look into his truck." It was to this that Belcher replied "okay" and he now contends that he was being told that they were going to look into his truck and that his only consent was to turn off his motor. We agree that the testimony in this respect is highly ambiguous and ordinarily would not come close to supporting a consent to search.

However, the record indicates quite clearly that Belcher's trial counsel thought he had consented. Thus, in the cross-examination of Leird the following appeared:

"Q And when you asked him for permission to look at the back of the truck, he told you, 'Fine,' or 'Okay,' did he not?

"A Yes, he did."

In the cross-examination of Officer Shea the following appears:

"Q And either you or Leird asked him permission to look in his truck, is that correct?

"A That is correct.

"Q And he said, 'Fine, okay, go ahead and look,' words to that effect?

"A His remark was 'Okay.' "

The reason for counsel for Belcher practically putting the words in the officers' mouths when they had testified ambiguously on direct examination becomes obvious when we look at the final argument of Belcher's counsel. Attempting to show that Belcher had been "framed" by Claffy and to show that he really did not know that the merchandise was in the truck, the attorney argued to the jury as follows:

"Now, Burke walks up to his truck and there is conversation, and I think you remember the conversation very well.

" 'Do you want to look in the truck?' 'Sure, okay.'

"They go back behind the truck, they open up the truck. 'That is not my merchandise.' "

Apparently the trial strategy did not achieve the desired result and another tack is now being taken on appeal. Be-

cause of the result already reached we need not decide whether there was consent but do note the impact of lack of consent is certainly minimized under these circumstances.

■ Belcher's second contention is that the proof did not sustain the charges of the indictment because of want of proof of asportation.

Counts III and IV charged Belcher with unlawfully, wilfully and intentionally stealing, embezzling, taking and carrying away with intent to convert to his own use certain specific goods. Defendant argues that, if anything, the proof indicates that he was a receiver of stolen property. This seems to be based on the theory that since Claffy was responsible for the physical acts of placing the goods on the truck, the only control over the goods which can be attributed to Belcher is as a receiver. Since the law recognizes that one cannot be both a thief and a receiver of the same stolen goods, defendants contends that the convictions cannot stand.

We find defendant's reliance upon United States v. Fusco, 398 F.2d 32, 36 (7th Cir. 1968), to be misplaced. In the instant case, the district court instructed the jury as to the purport of 18 U.S.C. § 2(b). 18 U.S.C. § 2(b) provides:

"Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

The district judge instructed the jury as follows:

"Now, it is not necessary to prove that the defendant here personally did every act constituting the offense charged. As a general rule, whatever any person is legally capable of doing himself he can do through another. So if the acts or conduct of another are wilfully ordered or directed or wilfully authorized or consented to by the defendant, then the law holds the defendant responsible for such acts or conduct the same as if he had personally—as if they had personally been done by the defendant."

There was sufficient proof from which the jury could have concluded that defendant wilfully caused the acts to be done by Claffy. If Claffy were charged with the acts here in dispute, it is clear the asportation argument would be without merit. United States v. Fusco, supra, 398 F.2d at 35–36 n. 2. We have carefully reviewed the evidence adduced at the trial below and the district judge's instructions to the jury based on such evidence. We are convinced that the jury was properly apprised of the applicable law and could reasonably have concluded as it did.

■ Belcher's final contention is that the court erred in not giving his tendered instruction I, which reads as follows:

"You should scrutinize very carefully the testimony of any witness who has turned 'government's witness' insofar as to incriminate himself, or with others in the offense charged. That evidence is not to be taken as that of an ordinary witness of good character. On the contrary, the evidence of such a witness ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses."

The record reflects that during the course of settling the instructions, the Government's instructions were first considered and thereafter the attention was directed to the defendant's instructions. When defendant's tendered instruction G was reached, the court noted that it pertained to a witness who had been promised a reward. Counsel for the Government observed that the Government had tendered an accomplice instruction and that the tendered instruction seemed to be reiterating a point.

The Government's tendered instruction on the accomplice [Claffy] as given by the court to the jury reads as follows:

"Now, in law an accomplice is one who voluntarily participates in the commission or the planning of a crime.

If you believe the witness James Claffy directly participated as an accomplice in the commission of the offenses charged, his testimony should be closely examined and weighed with great care. If you believe the testimony of an accomplice to be true beyond a reasonable doubt, that testimony is sufficient to convict the defendant even though it has not been corroborated by other evidence."

Nevertheless, despite this mild questioning by the Government, colloquy continued as a result of which the court did give, with some amendment which apparently was agreeable to counsel for Belcher, the tendered instruction in the following form:

"If you find from the evidence that any witness for the prosecution has been promised immunity or reward or has received immunity from prosecution in regard to Counts I, II and III for any testimony given by him in this case, as a result of or dependent upon his testimony, then you are entitled to consider that fact in weighing his credibility and truthfulness as a witness. The testimony of any such person so promised or given immunity or regard [sic] should be received and considered and scrutinized with great care."

When tendered instruction I was reached, the court indicated that it would be refused because it had already been given. To this counsel for Belcher responded only as follows: "Well, this is a little different language." The court again indicated the instruction would be refused and counsel for Belcher merely stated, "I object to the refusal," without advancing to the court any further reasons in support of the tendered instruction.

On this appeal, Belcher attempts for our benefit to elucidate that which he did not see fit to do for the trial judge. He contends that he was entitled to this general instruction so as to encompass the witnesses, Smith and Sagami. Sagami has been referred to in this opinion and

Smith was the employee who put the Sagami furniture on Belcher's truck.

However, a critical analysis of instruction I indicates that the instruction would not have been supportive of that theory. Defendant finds support in the words "any witness" in the first sentence of the tendered instruction as enlarging the instruction G to include others besides Claffy. We find, however, that "any witness" is limited to any witness who has incriminated himself or with others "in the offense charged." The key words of "incriminate" and "offense charged" would preclude the application to Smith and Sagami.

In view of the fact that a proper interpretation of I shows that it applies to Claffy only as did G, the counsel's statement that it was a little different language properly defines the extent of the difference. We therefore find the contention to be without merit.

Further, if counsel on trial had any other theory in offering this instruction, and we find no support for this view in the record, he had some duty to indicate his theory of differentiation over and above stating that it was "a little different language" which merely connotes that the same matter is being covered.

Belcher contends in his reply brief that this would be an imposition not only on the defense but on the court to inform the trial court what he thinks is the law has been reflected in his instruction. At least, however, counsel should bring to the attention of the trial court that a different and significant subject matter is being covered. In addition, counsel should be prepared to support any tendered instruction as being a correct statement of law. We are not unmindful that Rule 51, Fed.R.Civ.P., provides that no party may assign as error "the giving or the failure to give an instruction" unless he timely objects thereto whereas Rule 30, Fed.R.Crim.P., is worded, no party may assign as error "any portion of the charge or omission" of the giving of the tendered instruction. We find Belcher's statement to the

court insufficient to comply with Rule 30. The necessity for this procedure and the rationale thereof is set forth in the opinion of this court written by Judge Lindley as follows:

"Criminal Procedure Rule 30, 18 U.S.C. providing that no party may assign as error giving or failure to give an instruction, unless he objects thereto, stating distinctly the matter to which he objects and the grounds of his objection, has the force of law. Under it the objecting party must state specifically to what he objects and the grounds for his objection. It is a salutary rule, for its purpose is to give the judge an opportunity to make any correction which he thinks is proper and, thus, to minimize the possibility of error. Hower v. Roberts, 8 Cir., 153 F.2d 726. It is intended to prevent a litigant from taking advantage, after verdict, of the giving of an erroneous instruction to which he failed to call attention in time to afford the court an opportunity to correct it. Palmer v. Miller, 8 Cir., 145 F.2d 926. Unless the objection is made before verdict, a reviewing court is powerless to consider it; it can not be raised for the first time on motion for new trial or on appeal. * * * If the objecting party does not state in the trial court before verdict, the grounds of his objections and call the attention of the trial court to the claimed error, he is deemed to have waived the right to object." United States v. Furlong, 194 F.2d 1, 3 (7th Cir. 1952). (Citations omitted.)

*See also* United States v. Bender, 218 F.2d 869, 875 (7th Cir. 1955), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253.

In passing on this matter we do not intend to express any opinion whatsoever as to whether the tendered instruction I correctly stated the law. We were not favored, even on appeal, by any citation of a case showing that this is a correct statement of the law. Since we dispose of the matter on other grounds, we do not deem it necessary to research the matter of the legality of the instruction.

For the reasons hereinbefore set out, the judgment of the district court is affirmed.

Affirmed.