UNITED STATES of America, Plaintiff-Appellee,

v.

Michael Anthony SINACOLA, Defendant-Appellant.

No. 72-1760.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1973.

Decided April 3, 1973.

Rehearing Denied April 24, 1973.

Albert H. Beaver, Roger D. Klaus, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Glynna W. Freeman, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and STEVENS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The main point argued in this appeal is whether a theft or embezzlement of interstate goods occurred prior or subsequent to the defendant's surrender of his possession of the goods.

Defendant Michael Anthony Sinacola was sentenced after a jury trial to six months in prison and two and one-half years probation for violation of 18 U.S. C. § 659.[1]

1. The pertinent part reads: "Whoever . . . has in his possession any such

goods or chattels [which constitute an interstate shipment of property], knowing

According to the testimony of Roy Thurman Wagner, the owner of a company which bought submersible sump pumps and sold them to contractors to install in homes, defendant, an employee of Associated Truck Lines, Incorporated, regularly delivered to Wagner's company pumps which Wagner purchased from Piqua Machine & Mfg. Co., in Piqua, Ohio. On November 13, 1970, Wagner ordered what amounted to 239 cartons of pumps and 8 cartons of repair parts from Piqua with a total value of about $18,000 for delivery about November 23. On the latter date, defendant came to see Wagner and asked why he hadn't delivered any pumps to Wagner lately. Wagner explained that the 247 cartons were presumably leaving Piqua that very day. Defendant then suggested "why don't we see if we can get this one free." When Wagner asked how, defendant replied that "we can get them at the truck dock, delivered to you with no freight bill . . . ."

After more conversation, Wagner testified that "I finally agreed . . . that he would steal the pumps at the dock and I would accept the pumps," with the proceeds to be "split 50–50."

The 247 cartons of pumps were delivered by Piqua to the Chicago freight docks of Associated Truck Lines by means of an Associated truck trailer which arrived from Dayton, Ohio, on November 27, 1970. The trailer was unloaded and its contents distributed among several of Associated's docks for ultimate delivery to the various consignees. The 247 cartons consigned to Wagner were delivered to dock 60, assigned to defendant, and loaded on trailer 622, also assigned to defendant.

Defendant arrived at the Associated terminal before the normal starting time of 8:00 o'clock in the morning and at 8:20 he left the terminal with trailer 622. About 9:00 o'clock, defendant drove his truck into the Wagner Company garage. Defendant told Wagner that "Santa Claus had come early and nobody had saw [sic] him and he didn't have to take the freight bill." The pumps were unloaded by Wagner and the defendant, during which time defendant said that he would be entitled to $9,000 and could he get $4,000 in cash right away. Wagner told him that he could only raise the cash by selling the pumps. The conversation at that time also emphasized that the scheme involved "no invoices" and defendant told Wagner that there would be no freight bills. The unloading was completed by 9:30 and defendant eventually returned to the Associated terminal, reaching there at 10:40 in the morning.

Wagner then moved most of the pumps to a garage he had rented for the purpose across the alley from his home. At about 3:00 o'clock that afternoon, defendant telephoned Wagner and told him to call Associated and complain about not receiving the pumps, which Wagner proceeded to do on both November 30 and December 1. On December 4, an FBI agent visited Wagner and the pumps were subsequently recovered from Wagner by the FBI.

Defendant's primary contention is as follows:

"Whether the defendant, Michael Sinacola, be viewed as an employee, agent or bailee, it is apparent that there was no unlawful possession or taking of his employer's goods until that time when the co-defendant, Roy Wagner, took the first illegal act—notifying Associated Truck Lines that he had not received the pumps, and this act occurred after defendant, Michael Sinacola, had relinquished possession, thus making it impossible as a matter of law for him to be guilty of the offense of possession of stolen property."

Government Exhibit 2 is a copy of the "way-bill," which was prepared in the regular and ordinary course of Associat-

the same to have been embezzled or stolen . . . . [s]hall in each case be fined not more than $5,000 or imprisoned not

more than ten years or both [if the goods exceed $100 in value]."

ed's business, as testified to by Associated's Chicago manager. A copy of the way-bill is required to be signed by the consignee as a receipt acknowledging delivery to the consignee of the goods shown on the way-bill, in this case 247 cartons of power pumps and service parts. The crux and genius of defendant's scheme in this case was to get the pumps out of Associated's terminal without defendant taking the "freight bill" or "invoice" and without Wagner signing the way-bill when he received the merchandise.

In United States v. Fusco, 398 F.2d 32 (7th Cir. 1968), Malone was a truck driver for Mobil Oil Corporation. In 1967, he was scheduled to deliver 8500 gallons of gasoline to a Hyde Park gasoline station. He delivered all but 470 gallons which he then delivered to Fusco's station and sold to him for $40.00. Malone then cranked receipts from his truck's automatic meter for 8500 gallons and turned them in to Mobil as evidencing delivery of 8500 gallons to Hyde Park. Both Fusco and Malone were charged with violations of 18 U.S.C. § 659.

The conviction of Fusco was reversed by this Court on the ground that he was a receiver of stolen goods rather than a thief since the theft occurred at the Hyde Park station and not later at Fusco's station. This Court said at 398 F. 2d 35:

> "In this case, Malone purposely left the delivery tickets in the meter after he acquired dominion over the 470 gallons of gas with a view to disposing of them later, thus evidence of his 'intent to convert [these gallons] to his own use and of the completion of the crime' at the Hyde Park station."

In the present case, defendant purposely left the way-bill at the Associated terminal ("Santa Claus had come early . . . and he didn't have to take the freight bill") after he acquired dominion over the 247 cartons of pumps with a view to disposing of them later through Wagner.

In United States v. De Normand, 149 F.2d 622 (2d Cir.), cert. denied, 326 U. S. 756, 66 S.Ct. 89, 90 L.Ed. 454 (1945), the defendants were hijackers charged with violations of 18 U.S.C. § 409, the predecessor of § 659. The driver of one of the trucks involved parked it in the street when he went for coffee. When he returned the defendants took him back to his terminal at gunpoint and placed him bound and gagged in an empty truck. They then left the terminal and headed back toward the original parked truck but were arrested before they reached it. The truck remained sealed and none of its contents had been removed or even touched. The court rejected the contention that the statute had not been violated "because there was no asportation of the truck or any of its contents." In affirming defendants' convictions, Judge Swan said at page 624 that "[t]he unlawful 'taking' of constructive possession should . . . serve to complete the offense . . . ."

Likewise in United States v. Padilla, 374 F.2d 782 (2d Cir. 1967), a helper on a truck was able to slip some merchandise out of a carton in his truck without breaking the sealed carton. He concealed two pairs of slacks removed from the carton in the front cab of the truck. His conviction under 18 U.S.C. § 659 was affirmed, the court saying at page 785:

> "Here Padilla actually reduced the slacks to his physical possession, exercised dominion over them with intent to convert them to his own use and hid them for later disposition."

In the present case, when defendant left the terminal without the way-bill he acquired constructive possession (as opposed to the custody he would have exercised as an honest employee) over the 247 cartons; he exercised dominion over them with intent to convert them to his own use; and he violated 18 U.S.C. § 659.

United States v. Belcher, 448 F.2d 494 (7th Cir. 1971), is very similar to this

case. Belcher was a truck driver for Hires Trucking Company. Claffy was a loader of freight for Acme Fast Freight. One day Claffy inadvertently loaded some merchandise on Belcher's truck. When Claffy later inquired about the merchandise, Belcher told him that he had sold it. Thereafter, Claffy frequently threw items not intended for Hires Trucking Company or its consignees onto Belcher's truck and Belcher paid Claffy from $20 to $100 for each such load. Through police surveillance, Claffy was observed loading unauthorized merchandise on Belcher's truck and as he was about to drive away, Belcher was stopped and the police officers searched his truck. Belcher said, "How did this stuff get on my truck? That is not my freight. I don't know how it got there." A jury found Belcher guilty of violations of 18 U.S.C. § 659 for theft of merchandise for which he did not have freight bills. On appeal one of Belcher's contentions was want of proof of asportation. This Court said in affirming his conviction, at 448 F.2d 499:

> "There was sufficient proof from which the jury could have concluded that defendant wilfully caused the acts to be done by Claffy. If Claffy were charged with the acts here in dispute, it is clear the asportation argument would be without merit."

The proposed new federal criminal code includes in the term "theft" embezzlement as well (Final Report, §

1731) and codifies the concept of theft as follows (§ 1732):

> "A person is guilty of theft if he:
>
> (a) knowingly takes or exercises unauthorized control over, or makes an unauthorized transfer of an interest in, the property of another with intent to deprive the owner thereof;
>
> "(b) knowingly obtains the property of another by deception or by threat with intent to deprive the owner thereof, or intentionally deprives another of his property by deception or by threat; or
>
> "(c) knowingly receives, retains or disposes of property of another which has been stolen, with intent to deprive the owner thereof."

Under all of these authorities the theft or embezzlement occurred here when the defendant left the terminal without the necessary shipping documents and with the intent to steal the merchandise.[2] This act was no different than if defendant or Wagner broke into the Associated terminal the night before and stole the Wagner goods, intending to charge Associated with their loss. Nor is it of any more consequence that defendant conceivably could have returned to retrieve the shipping documents than it would be for defendant or Wagner to break into the terminal on the succeeding night to return the goods.

Furthermore, even if it could be assumed that the theft did not occur at the time of departure from the terminal,[3] it most certainly occurred

---

2. The facts that Wagner already was or shortly would become the owner of the goods and that defendant was on his way to deliver the goods to Wagner is immaterial under the circumstances of this case. "Property in the hands of a bailee may be stolen by the general owner; as for instance, where it is taken with intent to charge the bailee with its value." Mill, Criminal Law § 110 at 347 (1934). "A man may be guilty of a felony, in stealing his own goods from a pawnbroker, with whom he had pledged them, or from any one to whom he had entrusted them, with intent to charge said bailee their value."

Blackstone, Commentaries on the Law 848 (Gavit ed. 1941).

3. We are not confronted here with the problem of United States v. Fusco, 398 F. 2d 32 (7th Cir. 1968), where the theft occurred prior to the receipt of the goods by the ultimate recipient (such as Wagner here), thus making the ultimate recipient guilty as a receiver of stolen goods instead of as a thief. Here Wagner pleaded guilty to violations of 18 U.S.C. § 659, was placed on probation for two years and fined $3,000, and did not appeal.

during the thirty to forty minutes that defendant and Wagner jointly unloaded the 247 cartons with intent to steal them by failure to receipt the way-bill. During that period the two of them had joint possession of the stolen goods.[4]

The district court properly instructed the jury in regard to defendant's theory that if the theft in fact occurred when Wagner telephoned Associated on two succeeding days following the delivery by defendant, then defendant would not have had possession of stolen goods. The court instructed the jury as follows:

"Whether the property was stolen is a question of fact to be determined by the jury from all of the evidence you have heard.

"If you find from all of the evidence that the sump pumps involved here were not stolen until or after the time at which Roy Wagner received and accepted the pumps and later denied receiving them, then you cannot convict the defendant of the crime charged."

Defendant has also argued that some of the government's exhibits were admitted without proper foundation and that consequently the government failed to prove the interstate character of the shipment of the 247 cartons.

§ 659 provides in part:

"To establish the interstate or foreign commerce character of any shipment in any prosecution under this section the waybill or other shipping document . . . shall be prima facie evidence of the place from which and to which such shipment was made."

Steve Generis, the Chicago manager of Associated Truck Lines, Incorporated, testified that Government Exhibit 2, the way-bill showing shipment of 247 cartons of sump pumps and service parts from Dayton, Ohio to Chicago, Illinois, was prepared and maintained by his company in the regular and ordinary course of its business. In addition, the testimony of several witnesses established the interstate character of the stolen merchandise. Under these circumstances we need not decide whether the foundation for the introduction of cumulative evidence of the interstate character of the goods, such as the sump pump manufacturer's invoice and bill of lading (Government Exs. 1 and 3) was adequately laid by the testimony of the recipients of those documents (Wagner and Associated) instead of by a representative of the sump pump manufacturer.

We have considered defendant's other arguments and find them to be without merit. The judgment of conviction is affirmed.

Affirmed.

STEVENS, Circuit Judge (dissenting).

Sinacola had physical possession of the goods for a limited period on November 27, 1970. They were loaded on trailer 622 by other employees of the carrier; he hauled them to their assigned destination; and he completed their delivery by helping the consignee unload the trailer. Had he opened a carton,[1] caused someone else to place loot on his trailer,[2] acquired constructive possession of another truck by kidnapping its driver,[3] or departed for an un-

---

4. This theory of the timing of the theft might have been more tenable than the terminal-departure theory had not the defendant been the mastermind of the whole scheme.

1. United States v. Padilla, 374 F.2d 782, 787–788 (2d Cir. 1967) ("[T]he evidence clearly showed that Padilla took physical possession of the slacks, exercised domin-

ion over them to the exclusion of the owner. . . .").

2. United States v. Belcher, 448 F.2d 494, 499 (7th Cir. 1971) ("There was sufficient proof from which the jury could have concluded that defendant wilfully caused the acts to be done by Claffy.").

3. United States v. DeNormand, 149 F.2d 622, 624 (2d Cir. 1945) ("By that act

authorized delivery point,[4] for the purpose of converting goods to his own use, a statutory theft would certainly have occurred. But the times when, and the places where, Sinacola had possession of the goods described in the indictment were without exception authorized by the shipper, the carrier, and the consignee. However evil his subjective intent, I am therefore persuaded that no theft occurred before the goods were delivered to the consignee.[5]

Conceivably the confusing evidence relating to the missing shipping documents would support the conclusion that they deprived the carrier of power to exercise control or dominion over the truck and acquired such power for themselves; thus, whatever possession the carrier or its employee had was transferred to them.").

4. United States v. Fusco, 398 F.2d 32 (7th Cir. 1968) (When the driver curtailed delivery of the full order at the Hyde Park station and left for Fusco's place of business, he "took possession for his own purposes at the Hyde Park station." Presumably the driver's illegal intent existed from the moment he left the Hammond terminal, but the theft did not occur until he committed an overt act inconsistent with his authorized mission. I do not believe a driver's possession can be both lawful and unlawful at the same time).

5. Helping to unload the trailer would seem to be within Sinacola's authority to make delivery to the consignee. He had neither the right nor the duty to obtain a signed receipt until that was done.

6. The legal question of whether, and if so when, a theft occurred is unusually sophisticated because the consignee was both the owner of the goods and Sinacola's co-conspirator. Sinacola never did anything to deprive the owner of his right to possession. Nevertheless, in collusion with the owner, Sinacola theoretically could steal the goods from Associated, which was both his employer and the owner's carrier-bailee. While Sinacola had physical control of the goods, he either held lawful possession on behalf of the carrier or unlawful possession on behalf of his co-conspirator. I do not believe his possession could be both lawful and unlawful at the same time; in my opinion an overt act of "appropriation" inconsistent with his lawful status was required to

Sinacola "stole" the goods when he drove away from the terminal. I assume conduct, plainly at odds with normal procedure, coupled with an intent to convert, might be a theft within § 659. As the case was argued and submitted, however, the jury was not required to find that any unauthorized overt act was performed by defendant before he completed his delivery of the goods to the consignee.[6] In short, the conviction may rest on nothing more than authorized conduct accompanied by wrongful intent. In my opinion this is not enough.

consummate the theft. The instructions to the jury failed to define this critical factual issue.

The jury was instructed as follows:

"The Government must prove that these sump pumps had been stolen and unlawfully taken from an interstate shipment of freight. With regard to that, merchandise is considered stolen and unlawfully taken, if it has been appropriated from its lawful owner or possessor with the intent to deprive the owner or possessor of the rights and benefits of ownership or possession.

\* \* \* \* \*

"If you find from all of the evidence that the sump pumps involved here were not stolen until or after the time at which Roy Wagner received and accepted the pumps and later denied receiving them, then you cannot convict the defendant of the crime charged." Tr. 9, 11.

The defendant had requested a more careful instruction:

"Knowing possession of stolen property is dependent upon defendant's dominion and control over the stolen property, and this dominion and control, to amount to unlawful possession, must be such that it exceeds defendant's lawful control and custody in the ordinary course of business." Defendant's Requested Instruction No. F.

"If you find from all the evidence that the pumps were placed on a trailer driven by the defendant in the normal course of the business of Associated Truck Lines, and delivered to the consignee, Roy Wagner, in the normal course of the business of Associated Truck Lines, then you must find that the pumps were not stolen before or during the time in which the defendant is alleged to have had possession." Defendant's Requested Instruction No. J.