**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Pasquale Charles MARZANO,
Defendant-Appellant.**

**No. 75–1511.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 11, 1976.

Decided May 18, 1976.

Rehearing and Rehearing En Banc
Denied June 28, 1976.

Julius Lucius Echeles, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., James M. Breen, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, CUMMINGS, and PELL, Circuit Judges.

PELL, Circuit Judge.

This case arose out of a widely publicized theft of more than three million dollars from the vaults of Purolator Security, Inc. in Chicago, Illinois, sometime Sunday evening or Monday morning, October 20 or 21, 1974. The company was engaged in the business of providing armored car service for the transportation of cash between banks and business establishments.

In November 1974, an indictment was returned against Pasquale Marzano, William Marzano, Ralph Marrera, Luigi DiFonzo, Peter Gushi, and James Maniatis. Count one of the indictment charged these persons with conspiracy to commit various offenses including the theft of money from Purolator Security, Inc. Counts two through seven charged the two Marzanos and Marrera with taking money belonging to various banks[1] from the possession of Purolator in violation of 18 U.S.C. § 2113(b).[2] Gushi and Maniatis were charged with aiding and abetting in each of these counts. Count eight charged the same persons with the same offenses as counts two through seven but included all the banks in the one count. Count nine charged the Marzanos and Marrera with entering a building used in part as a bank for the possession of money belonging to Merchandise National Bank with the intent to commit a felony in violation of 18 U.S.C. § 2113(a). Gushi and Maniatis were charged with aiding and abetting that offense. Counts ten and eleven charged the Marzanos and Marrera with the use of an explosive in violation of 18 U.S.C. § 844(h)(1) and 18 U.S.C. § 844(i), respectively, and Gushi and Maniatis with aiding and abetting these offenses. Count twelve charged the Marzanos, DiFonzo, and Gushi with transporting stolen money in violation of 18 U.S.C. § 2314.[3]

Maniatis pled guilty to counts one through eight, and the remaining counts

---

1. Count 2 Merchandise National Bank of Chicago $1,165,204.00
 Count 3 Central National Bank $ 562,610.00
 Count 4 Exchange National Bank $ 66,500.00
 Count 5 Ford City Bank $ 378,850.00
 Count 6 Peterson Motor Bank $ 10,000.00
 Count 7 Metropolitan Bank and Trust Company $ 19,000.00

2. 18 U.S.C. § 2113(b) provides:

 Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both; or

 Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value not exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

3. 18 U.S.C. § 2314 provides:

 Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; or

against him were dismissed. Gushi pled guilty to all counts except count eight. The Government moved to dismiss counts eight and nine against the remaining defendants, and that motion was granted. William Marzano pled guilty to the remaining counts although the guilty plea to count ten was apparently withdrawn later. Marrera was severed from the other defendants because of a competency question as to him. Pasquale Marzano and DiFonzo were tried before a jury. DiFonzo was found not guilty on all counts; Pasquale Marzano was found not guilty on counts ten and eleven but guilty on counts one through seven and twelve. He is the sole defendant on this appeal and will sometimes herein be referred to as the "defendant."

A detailed recitation of the evidence against Marzano is unnecessary to resolve the issues presented on this appeal. The witnesses against the defendant included Gushi, who testified to much of the planning of the theft; Martin Pollakov, an undercover informant for the Illinois Legislative Investigating Commission (ILIC) who worked at a discount store owned by Gushi while investigating possible fencing operations and who met with defendant and Gushi on several occasions; and Edward Doyle, an agent of the ILIC who posed as Pollakov's friend and worked as a handyman and errand boy at the store. In addition, expert testimony was presented which indicated that paint chips from the containers that Purolator used to store money were found in a van that defendant had been seen driving, although always with gloves, and which had been purchased with funds which had at least partially been provided

by him. The most direct evidence was provided by Gushi.

## I. Right to Confrontation

Defendant argues that he was deprived of his Sixth Amendment right to confrontation, his due process right to a fair trial, and his constitutional right to present defense evidence because the trial judge unduly limited his cross-examination of Gushi and unduly limited him in presenting extrinsic evidence showing Gushi's self-interest and bias.

The various errors alleged must be considered in the context of the entire trial and in light of their probable cumulative prejudicial effect. Of necessity, however, the errors alleged must be discussed individually.

### A. Guishi's Hopes

■ Defendant argues that his counsel was improperly restricted in questioning Gushi about his hopes of avoiding prison. Counsel asked:

Q. Well, then, it is your present testimony that when you made the statement now "that because of your testimony, people will go to jail," you are also hopeful that if others go to jail you won't. Isn't that true?

Mr. Breen: Objection.

By Mr. Echeles:

Q. You are hopeful of that, aren't you?

The Court: Sustained.

This question followed a series of argumentative questions. Counsel was permitted to bring out that Gushi was facing 115 years imprisonment by virtue of pleading guilty to the indictment; that while in pris-

---

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any traveler's check bearing a forged countersignature; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce, any tool, implement, or thing used or fitted to

be used in falsely making, forging, altering, or counterfeiting any security or tax stamps, or any part thereof—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country.

on previously, he had attempted suicide because he could not take the prospect of serving more time; that he disliked and feared the prospect of going to prison; that he would like not to go to prison if possible; that he was concerned about his family if he had to serve more time; and that he hoped his wife would not be prosecuted for offenses which his testimony indicated she had committed. Some of these points were brought out more than once. In closing argument defense counsel argued that Gushi testified as he did to protect his wife from criminal charges and because he "knew" someone would "get him off."

The jury was clearly aware that Gushi had much to lose by not cooperating with the Government and could not have been unaware that he hoped to avoid a prison sentence. We cannot hold that it was reversible error for the court to sustain the Government's objection to a question of doubtful propriety, the answer to which could only have repeated what appears adequately elsewhere in the record.

■ Defendant argues that the trial judge informed the jury that there was no merit to the defense theory that Gushi was biased and effectively diluted defendant's right to have the jury draw permissible inferences regarding Gushi's credibility. The record does not support this argument.

During closing argument the following colloquy occurred:

Mr. Echeles:

. . . . . .

Let me show you. He doesn't want to go back to the penitentiary. Yes, I think about suicide. I am facing 115 years when I pled guilty.

My god, he pled guilty to torching. He pled guilty to the accusations in the indictment, notwithstanding on the witness stand he said he had nothing to do with it because he doesn't care, because he knows somehow Oitzinger, or somebody in the FBI is going to get him off.

The Court: Don't invade my province.

Mr. Echeles: It is not your power. It's afterwards, your Honor.

He doesn't care about pleading guilty even to count and charges to which from the witness stand, notwithstanding his pleas of guilty before Judge Bauer, he didn't do the things he says. He uses words, he uses concepts and ideas as suits him.

■ The trial judge did not prevent the defense from arguing its theory to the jury. He merely cautioned counsel against arguing that the Government had the power to determine Gushi's sentence. While a defendant has the right to have counsel argue that the jury should draw certain inferences from the evidence, a defendant has no right to have the jury draw incorrect inferences regarding the law. Defendant has not shown that his counsel was prevented from arguing that Gushi had hopes of avoiding prison as a result of his testimony.

The authority cited by defendants is inapposite. In *United States v. Dellinger,* 472 F.2d 340 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), it was held that the trial judge had made rulings during closing argument which were comparatively more restrictive to the defense than to the Government; no such showing was made in this case. Indeed, in the present case, the defense reply brief agreed "that the trial judge's demeanor and patience during this long and hotly contested trial was exemplary." In *United States v. Gonzalez,* 488 F.2d 833 (2d Cir. 1973), the trial judge made statements immediately after giving an accomplice instruction which negated the instruction and in effect indicated that the warnings in the instruction did not apply in that case. In *United States v. DeLoach,* 164 U.S.App.D.C. 116, 504 F.2d 185 (1974), the trial judge prevented defense counsel from arguing that certain factual inferences could be drawn from the evidence.

The attitude and hopes of the witness with regard to his own incarceration or other punishment for his participation could not have been other than obvious to the trier of fact from that which was in evidence. In sum, the trial judge was acting within his discretion in limiting defense

counsel's cross-examination and arguments regarding Gushi's hopes. *See United States v. Keefer,* 464 F.2d 1385, 1386 (7th Cir. 1972), *cert. denied,* 409 U.S. 983, 93 S.Ct. 322, 34 L.Ed.2d 247; *United States v. Peskin,* 527 F.2d 71, 82–83 (7th Cir. 1975). *Cf. Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974).

### B. *Bond Reduction*

■ Defendant argues that his counsel was improperly prevented from bringing out fully the circumstances of Gushi's bond reduction and that his rights were prejudiced by the trial judge's remarks regarding the bond reduction. Defendant admits that he was allowed to bring out that Gushi's bond was reduced from $1,000,000 to $50,000 in conjunction with a reduction in state court without opposition by the Government after several months of cooperation with the Government. Defendant complains that he was not permitted to bring out the location where the bond was set or posted or that Gushi's attorney was not present at the time the reduction was made.

It was within the discretion of the trial judge to sustain the Government's objection on the grounds of irrelevance to the questions regarding where the bond was set and posted. Counsel argues that the defense need not demonstrate the relevance of possible answers, citing cases such as *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624, 627 (1931), and *United States v. Varelli,* 407 F.2d 735, 749–51 (7th Cir. 1969). These cases hold that defense counsel should normally be permitted to inquire as to a witness's address. A witness's address can be highly relevant, *e. g.,* where the witness is in custody, or can lead to other relevant information where an address is not known. In contrast, the location where bond was set has at best marginal intrinsic relevance, and it has not been demonstrated to us that Gushi's answer could have led to other relevant information since defendant's counsel knew the bond had been set in the Northern District of Illinois; indeed, the remarks of the trial judge about which counsel complains reveal that he had set Gushi's bond.

■ The trial judge interrupted defense counsel when he asked a question implying that the Government had the power to determine when an accused could be released from custody on bond and that it had permitted Gushi to be released due to his cooperation. The judge stated: "Not precisely, Mr. Echeles. I entered the order reducing it without reference to cooperation. . . The United States Government, in the person of the Department of Justice, does not set bonds. I do." This is a correct statement of the law, and counsel was permitted to show there was no opposition to the reduction by the Government. Counsel argues that the court's comments diluted defendant's right to have the jury draw permissible inferences bearing on Gushi's credibility. This is not the case. The remarks only prevented the jury from drawing the erroneous inference that the Government has the power to raise or lower bonds.

Defendant further argues that bringing out the fact that Gushi's attorney was not present would have shown the extent of the Government's lack of opposition. The evidence was already clear that the Government made no objection whatsoever to the reduction. Again the trial court was acting within the limits of its discretion in refusing to allow the introduction of this marginally relevant evidence.

### C. *Extrinsic Evidence*

■ Defendant argues that he was improperly precluded from introducing testimony on various events showing reasons why Gushi might be biased. Evidence of prior illegal acts not resulting in convictions is not admissible to show a witness's general lack of character. Such evidence is admissible to show bias. *United States v. DeLeon,* 498 F.2d 1327, 1332–33 (7th Cir. 1974). *Accord, United States v. Lester,* 248 F.2d 329, 334 (2d Cir. 1957). The circumstances surrounding such acts are not relevant, or at least it is within the discretion of the trial judge to limit testimony regarding surrounding circumstances. *United States v. DeLeon, supra* at 1332–33.

■ Where bias is to be proved by showing a prior statement, a foundation must be laid by calling the statement to the witness's attention so that the witness may explain or deny the statement. *Smith v. United States,* 283 F.2d 16, 20–21 (6th Cir. 1960), *cert. denied,* 365 U.S. 847, 81 S.Ct. 808, 5 L.Ed.2d 811 (1961); IIIA Wigmore, *Evidence* § 953 (Chad. rev. 1970); McCormick, *Evidence* § 40 at 80 (2d ed. 1972) (majority rule); 3 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 607[03] at 607–32–33 (1975) (indicating this view should prevail under the Fed.R.Evid.). The reasons for this rule are closely analogous to the reasons for the rule requiring a foundation for impeachment by prior inconsistent statements.

There appears to be much conflict in the state courts regarding this rule. *Annot.,* 87 A.L.R.2d 407 (1963). This annotation, § 8, and Wigmore, *supra* at 801, indicate that federal authorities conflict on this point, but this conclusion appears unwarranted.

The annotation cites *Ewing v. United States,* 77 U.S.App.D.C. 14, 135 F.2d 633 (1942), *cert. denied,* 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145, for the proposition that a foundation is not required. The case in that regard is somewhat ambiguous, but any indication to that effect is clearly dicta because foundation questions had been asked. The district court in *United States v. White,* 225 F.Supp. 514, 520 (D.D.C.1963), *rev'd on other grounds,* 121 U.S.App.D.C. 287, 349 F.2d 965 (1965), held that *Ewing* was not controlling; the court of appeals did not comment. We note that even in *Ewing* the court held that it would be objectionable to permit a witness to testify as to a cause of bias before the allegedly biased witness testified. We believe that the current position of the Second Circuit is represented by *United States v. Kahn,* 472 F.2d 272, 281–82 (2d Cir. 1973), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 which follows *Smith,* and that therefore *Hoagland v. Canfield,* 160 F. 146 (S.D.N.Y. 1908), and *United States v. Schindler,* 10 F. 547 (S.D.N.Y.1880), cited in the annotation, have no continuing validity on this point.

*Comer v. Pennsylvania R. R. Co.,* 323 F.2d 863 (2d Cir. 1963), cited by Wigmore, involved evidence of conduct or a situation indicating possible bias rather than a statement showing bias. Whether a different rule should be applied where conduct rather than a statement is involved is not before this court. Many state courts draw this distinction. *Annot., supra.*

In this case it is abundantly clear that defendant was not prejudiced by the trial judge's application of the foundation rule. Before Pollakov was examined, a colloquy occurred during which the trial judge first inquired whether Pollakov would be available after Gushi testified and then ruled that he would not allow Pollakov to be questioned to show Gushi's cause for bias until after Gushi had testified and had been questioned concerning possible bias. Defense counsel expressed disagreement with the court's interpretation of the law, which we hold was correct, but stated that he understood the ruling and would comply with it.

■ The admission of extrinsic evidence is not exclusively conditioned on a witness's denial of making prior statements showing bias. A sufficient foundation is laid if the witness testifies that he does not remember making the statement or if he gives an equivocal response. *E. g.,* McCormick, *supra* at 81.

When defense counsel sought to present extrinsic evidence showing Gushi's bias through Pollakov, the district judge required counsel first to ask his questions outside the presence of the jury. Defendant argues that this was error.

He bases this argument principally on *United States v. Bohle,* 445 F.2d 54 (7th Cir. 1971). In *Bohle* defense counsel sought to impeach a key Government witness by proving that she had made prior inconsistent statements. The trial court required defense counsel to ask the witness foundation questions outside the presence of the jury. When the witness denied making the statements, the judge ruled that the questions could not be asked in the presence of the jury unless someone was present who

could testify that the witness had made the statements. This court held that the procedure constituted reversible error because it enabled the witness to eliminate any reaction of surprise before being confronted with the inconsistent statements in front of the jury. The court noted that attorneys are officers of the court and that it hoped the occasions of putting prejudicial material before a jury without intending to make use of the foundation laid would be minimal. Nevertheless, it stated that regulation may sometimes be necessary, especially in a criminal case where such an abuse could not be remedied by reversal of a tainted victory for the defense.

■ In this case the trial judge did not require a voir dire of Gushi outside the presence of the jury but allowed proper foundation questions to be asked.[4] Then before allowing possibly prejudicial material to be brought before the jury by suggestive questions a second time, he required substantiation of the various allegations by the voir dire procedure. We hold that the trial judge was acting well within his discretion in so doing.

The defendant argues that the rationale of *Bohle* applies to this case because the jury should have been allowed to evaluate the impeaching testimony. This argument attacks the judge's decision to exclude most of the material uncovered in the voir dire hearing rather than the propriety of having the hearing outside the presence of the jury. The information revealed in the voir dire hearing is discussed in detail *infra*; but the short answer to defendant's arguments is that the trial judge was acting within his discretion to limit the introduction of marginally relevant prejudicial evidence. *E. g. United States v. Peskin, supra.* This is especially true in this case where the form of the questions asked to elicit the information suggests misconduct far greater than that supported by the evidence.

The defendant also suggests that the voir dire procedure was improper because the questions would have the effect of impeaching Pollakov by reflecting on his ability to remember and relate prior events. The value of the questions as impeachment of Pollakov must be considered de minimis in light of the strong prejudice to the Government which would have resulted from the questions defendant's counsel sought to ask.

We now turn to the specific instances in which the defendant argues error occurred.

■ Defendant argues that he was improperly precluded from showing that Gushi had threatened Pollakov and his family and that he should have been permitted to utilize the transcript from Marrera's bond hearing to refresh Gushi's recollection of such threats. Gushi was never asked whether he had threatened Pollakov or his family. Gushi was asked: "Mr. Gushi, are there other criminal offenses which you committed for which you have not yet been arrested, about which the Federal government knows? Do you know?" The defense's theory is that this question is sufficient because threatening a witness is a crime under 18 U.S.C. § 1503. During the voir dire Pollakov only gave limited support to the existence of these threats. He testified that Gushi had once made a statement to his wife which he had thought might have been a threat and which he had reported to the authorities. He testified that he was unsure whether it was a threat.

The district court did not abuse its discretion by excluding Pollakov's testimony. The defense did not lay an adequate foundation to introduce it. The question quoted above and ones similar to it lacked requisite specificity. They did not call the incident in which counsel was interested to Gushi's attention, and therefore Gushi had no opportunity to explain his remarks. This defect cannot be considered merely technical because of Pollakov's uncertainty as to whether Gushi's remarks were a threat. There was no basis for using the transcript of the Marrera bond hearing to refresh

---

4. Defendant's arguments regarding restrictions placed on the cross-examination of Gushi are discussed *infra*.

Gushi's recollection when the remarks had not been called to his attention.

█ Defendant argues that his counsel was improperly prevented from questioning Doyle about Gushi's admission to Pollakov that he had once killed a man named Tony. Doyle's testimony occurred before Gushi testified. He had no personal knowledge regarding Gushi's alleged confession but was questioned regarding what he had been told by Pollakov. Gushi denied telling anyone that he had killed Tony although he admitted that he had been questioned by both state and federal authorities regarding such a killing. During the voir dire Pollakov testified that Gushi had once told him that years ago he had killed a man named Tony. The trial court instructed defense counsel that he could question Pollakov regarding Gushi's statements about the murder of Tony, and Pollakov repeated the essence of his testimony before the jury. Thus the defense had ample opportunity to bring the facts regarding Gushi's statement before the jury. Doyle's testimony would only have become relevant if Pollakov had denied that Gushi had made the statements, but he did not.

█ The defendant argues that his counsel was improperly prevented from questioning Pollakov concerning Gushi's possession of $13,000,000 of stolen securities. The defense theory is that this would not only have tended to show Gushi's bias by showing another crime with which Gushi could have been charged but would also have supported a theory of the defense that the defendant did not know the source of the money transported, i. e., the money could have come from a source other than the Purolator theft. Doyle testified that a score meant any type of criminal enterprise and that he had knowledge, though not personal knowledge, that Gushi was working on a score involving $13,000,000 of stolen securities. Gushi denied ever carrying stolen securities in a suitcase from New York or ever telling Pollakov that he had 20 years in a suitcase, meaning that if he were caught with the suitcase, the stolen securities which it contained could cost him a sentence of 20 years. Gushi testified that he had attempted to get between one and twenty million dollars of discount securities[5] for transfer to a man in France. On voir dire Pollakov testified that one time Gushi had come to the store and had said that he was carrying 20 years in his briefcase. He further testified that although there had been a lot of talk about the securities, Gushi had never actually said "stolen"; that it was his assumption that the securities were stolen; that he had told Doyle about the incident and had made reference to the securities as stolen; and that he had never heard Gushi refer to the term "score" as a synonym for "stolen." Defendant urges that his counsel should have been permitted to present Pollakov's testimony to the jury. While it might not have been error for the trial court to admit this testimony, it was not an abuse of discretion to exclude it. Doyle had already testified regarding the transaction. To some extent Pollakov's testimony weakened Doyle's unequivocal indication that Gushi was involved with $13,000,000 of stolen securities. This provided a sufficient basis for impeachment. It is within the trial court's discretion to determine the extent to which details of a witness's misconduct are brought before the jury. *United States v. DeLeon, supra.*

█ Defendant argues that it was error for the trial judge to preclude Pollakov from testifying about a threat by Gushi to kill a cash register salesman. Gushi denied ever making such a threat but admitted that he had told a cash register salesman to leave his store. The defense had a right to prove such a threat was made if it could, but on voir dire Pollakov testified that Gushi did not threaten the salesman's life though he yelled and screamed at him and chased him out of the store. He testified that Gushi never touched the salesman but

---

5. The exact meaning of the term, "discount securities," and the details of the scheme which Gushi explained are not relevant to this appeal.

said that two persons in the store had grabbed Gushi. Pollakov admitted that he might have told Doyle that Gushi threatened to kill the salesman. Since the defense could not substantiate its allegations of the threat, it was not error for the court to refuse to permit the matter to be raised before the jury a second time. In addition at most the threat would have been a state crime, and we have held that the United States Attorney's lack of power to cause or prevent a prosecution is a factor that may be considered by a district judge though it is doubtful whether that fact alone would be a sufficient basis to exclude such evidence. *United States v. Amabile*, 395 F.2d 47 (7th Cir. 1968), *rev'd on other grounds*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). *United States v. Masino*, 275 F.2d 129 (2d Cir. 1960), is not to the contrary. In that case it was held that it was error to exclude evidence showing that a state court charge had actually been quashed at the behest of the assistant United States Attorney prosecuting that case. *Id.* at 131–32.

■ Pollakov testified that Gushi told him he was tired of being broke and that he was going to engage in a big score and that he was going to go in with carbines and rifles and if any cop got in his way he was going to "take him out." He also testified that Gushi said he would have to "take four guys out of the way." Defendant complains because the trial judge did not permit Pollakov to respond to questions as to whether Pollakov interpreted the first statement to mean that Gushi was intending to kill a policeman or to explain the second statement. This was not error. The jury was as able as Pollakov to determine Gushi's meaning. Failure to allow Pollakov to answer these questions did not render this attempt to impeach Gushi meaningless as defendant argues.

■ The defendant argues that his counsel should have been permitted to ask Pollakov if Gushi told him that he was going to go over and shake down a Jew who owed Al Wainer, the financier of Gushi's store, $15,000. Gushi admitted that he was thinking of going over and trying to collect money for Wainer, but he denied using the words counsel suggested or making the statement in the way counsel made it. On voir dire Pollakov supported Gushi's version of the incident. It was not error for the trial court to refuse to permit counsel to imply misconduct which could not be established. He had a right to ask Gushi to lay a foundation, but he had no right to bring this potentially prejudicial material before the jury a second time.

■ Gushi testified that he told Maniatis to lie if anyone asked him what had been done with the truck that was used in the theft. Counsel for defendant then asked him whether his purpose was to protect Maniatis. The trial judge sustained the Government's objection. It is unclear why this was in any way relevant, especially in light of Gushi's admission in response to the next question that he lied when it suited his disposition.

The other evidentiary arguments which defendant makes are clearly without merit. He argues that his counsel was prevented from presenting evidence in support of his theory of the case, which is merely a repetition of the arguments made concerning the $13,000,000 of securities, and, apparently, that he was in some way limited in educing evidence about three separate scores. Gushi denied telling Pollakov that he was involved in three separate scores. The Government states in its answering brief that Pollakov was never asked about three scores. We have found no reference to three scores, and the defendant's reply brief sheds no light on the matter. The limitations on the cross-examination of Doyle were proper because when Doyle was questioned, Gushi had not testified; and Doyle admitted that he had no personal knowledge about most of the matters in which counsel was interested. Defendant indicates that counsel was somehow restricted regarding an alleged threat by Gushi to kill Doyle. Gushi testified that to the best of his recollection he never threatened Doyle, but defendant makes no showing that he was ever limited from presenting evidence about the matter. Similarly there is no

showing that counsel was ever prevented from introducing evidence about a $135,000 score. Gushi was cross-examined extensively regarding such a score, and defense counsel sought to imply that it referred to criminal activities. Gushi testified that the score referred to a brokers' fee he had earned with five others and that his share was $27,500.

### D. *Summary*

The defendant in his reply brief complains that the Government in responding to his brief treated each of his contentions as though it were in a vacuum without regard to the cumulative effect upon the jury's ultimate determination. Of necessity, we have had, as did the Government, to address ourselves to the individual contentions. Having done so, we have no difficulty in concluding that the cumulative effect of the court's rulings did not prevent the accomplishment of the defense objective of portraying fully the deficiencies of Gushi's character as a person and, more significantly, as a witness. We come away from an examination of the transcript with the distinct feeling that the defense was more interested in demonstrating that Gushi was really a very "bad guy," than it was in showing that he was biased or testifying untruthfully just to save his own skin. That the effort was not entirely without success may to some extent be explicative of what might appear to be the rather unaccountable acquittal of DiFonzo on the transportation count. That the defendant on the other hand was convicted cannot, in our opinion, stem from the fact that the jury was prevented from focusing on more than adequate criteria for evaluating the ultimate credibility of Gushi's testimony. Considering this lengthy trial as a whole, we find it free from reversible evidentiary error. The defendant's right to a fair trial and his right to confront witnesses were not violated.

### II. Seizure of Evidence on Grand Cayman Island

Within ten days of the Purolator theft, the FBI had apparently traced the defendant and DiFonzo to Grand Cayman Island. The details of their trip from Chicago to Grand Cayman are not relevant to this appeal. Defendant and DiFonzo were ultimately taken into custody by Detective Superintendent Derrick Tricker of the Grand Cayman police and placed on a plane for Miami. At the time they were taken into custody, money and various other items were taken from them. Defendants moved to suppress the use of these items as evidence. After an evidentiary hearing, the district judge denied the motion on the grounds that the FBI agents on the Island acted merely as observers and did not substantially participate in the arrest and seizure of evidence. The court made no finding as to whether the agents or Tricker had probable cause to arrest on the Island.[6] If this court found that the basis of the district court's ruling was improper, the remedy would not be to reverse defendant's conviction and order a new trial, as defendant argues, but would be to remand for an evidentiary hearing on whether probable cause to arrest existed. For the purposes of this opinion, we will assume that neither Tricker nor the FBI agents were aware of probable cause to arrest the defendant on October 30, 1974, in connection with the Purolator matter.[7] The defendant does not appear to contend that the arrest or search incident thereto was illegal under Cayman law.

In *United States v. Issod*, 508 F.2d 990, 994 (7th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975), this court held that if information is obtained in a search by a private individual absent probable cause, the information is usable if Government agents did not partic-

---

**6.** The opinion of the district court on this issue appears at 388 F.Supp. 906.

**7.** It would not be technically accurate to say that probable cause did not exist as a warrant

had been issued in the United States on the day of the arrest. That fact, however, was not known at the time of the arrest.

ipate in the search. The same standard applies when foreign law enforcement personnel obtain evidence through such a search. Whether the Government participated so as to render the search Government action must be determined by examining the facts surrounding the search. *United States v. Newton*, 510 F.2d 1149, 1153 (7th Cir. 1975).

 We must accept the factual findings of the district court on this issue unless they are clearly erroneous.. The district court found that Superintendent Tricker agreed to meet two FBI agents who were attempting to locate defendants, that Superintendent Tricker informed the agents that they could not carry weapons on the Island or interrogate or take into custody the defendants, that he further informed them that they had no jurisdiction but that they could accompany him on his investigation and that the agents did not take the defendants into custody or even speak to the defendants about the crime. Tricker took the defendants into custody for various infractions of Grand Cayman law and asked the defendants to board ·a plane bound for Miami after determining that the FBI was willing to pay the cost of defendants' airfare. He testified that the defendants had a choice about going to Miami but that he did not tell them so and that if the defendants had indicated that they wanted to go somewhere other than Miami, he would have had "to review the situation." From our examination of the suppression hearing transcript, we come away with the impression that Tricker jealously guarded his prerogatives and reached his own decisions about what to do with the information which the FBI had provided to him. The district judge found that even if the agents had desired to act without jurisdiction, Tricker would not have allowed it.

 The defendant argues that but for the information provided by the FBI, he would never have been taken into custody on Grand Cayman. This is perhaps a fair reading of the testimony; nevertheless, the law is clear that providing information to a foreign functionary is not sufficient involvement for the Government to be considered a participant in acts the foreign functionary takes based on that information. *Stonehill v. United States*, 405 F.2d 738, 746 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); *Gold v. United States*, 378 F.2d 588 (9th Cir. 1967); *Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir. 1965), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366; *Shurman v. United States*, 219 F.2d 282 (5th Cir. 1955), *cert. denied*, 349 U.S. 921, 75 S.Ct. 661, 99 L.Ed. 1253; *Sloane v. United States*, 47 F.2d 889 (10th Cir. 1931). FBI agents were present with Superintendent Tricker at various times during his investigation and search, but there is no evidence that they took an active part in interrogating or searching the suspects or in selecting evidence to seize. Mere presence of federal officers is not sufficient to make the officers participants. *Stonehill v. United States, supra* ; *United States v. Johnson*, 451 F.2d 1321 (4th Cir. 1971), *cert. denied*, 405 U.S. 1018, 92 S.Ct. 1298, 31 L.Ed.2d 480 (1972). Under the circumstances of this case the coincidence of these factors is insignificant. *See United States v. Johnson, supra.*

In *Stonehill* the Ninth Circuit held that before the Fourth Amendment applied, the participation of federal agents must be so substantial as to convert the search into a joint venture. The participation involved in *Stonehill* was substantially greater than that involved in this case, but the court held that the evidence obtained was admissible. We need not adopt the Ninth Circuit's standard at this time but only need to hold that the involvement of the Government agents in this case was too insignificant for them to be considered participants in the actions of the foreign police official.

Citing *Knoll Associates v. FTC*, 397 F.2d 530 (7th Cir. 1968), defendant argues that Tricker's purpose to help the United States is sufficient reason to prohibit the use of evidence he seized in violation of the Fourth Amendment. In *Knoll* this court held that

documents which had been stolen by a private citizen for the purpose of assisting the FTC in a proceeding then pending were inadmissible. This court relied on *Gambino v. United States,* 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927). In *Gambino* the Supreme Court held inadmissible the fruits of a search which had been made by a state officer solely for the purpose of fulfilling the duty he believed he had under state law to enforce the national prohibition act. This court has distinguished *Knoll* where the items challenged were rightfully acquired for purposes independent of helping the Government and where the items challenged were acquired eight months prior to contact by the Government. *United States v. Billingsley,* 440 F.2d 823 (7th Cir. 1971), *cert. denied,* 403 U.S. 909, 91 S.Ct. 2219, 29 L.Ed.2d 687; *United States v. Harper,* 458 F.2d 891 (7th Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1772, 32 L.Ed.2d 132 (1972). Recently this court made it clear that a mere purpose to assist the Government does not transform an otherwise private search into a Government search. *United States v. Newton, supra,* 510 F.2d at 1153. See also *Gold v. United States, supra.* The defendants violated Grand Cayman law, according to Tricker, and that is the reason for which he arrested them. That he might also have intended to help the United States is not a sufficient reason to treat his actions as those of United States agents.

In *Brulay v. United States,* 383 F.2d 345 (9th Cir. 1967), *cert. denied,* 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478, a case similar to the one before us, the Ninth Circuit stated:

> The Fourth Amendment does not, by its language, require the exclusion of evidence and the exclusionary rule announced in *Weeks* [*v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914),] is a court-created prophylaxis designed to deter federal officers from violating the Fourth Amendment. Neither the Fourth nor the Fourteenth Amendments are directed at Mexican officials and no prophylactic purpose is served by applying an exclusionary rule here since

what we do will not alter the search policies of the sovereign Nation of Mexico. *Id.* at 348.

No purpose would be served by excluding the evidence taken by Superintendent Tricker and turned over to the FBI in Grand Cayman.

■ Defendant argues that even if the Government was not a participant in Tricker's actions, an illegal seizure took place when he turned the items taken from the defendant and DiFonzo over to the FBI on Grand Cayman. Superintendent Tricker's action in turning the items over to the FBI was totally voluntary. Thus, no seizure took place. *Coolidge v. New Hampshire,* 403 U.S. 443, 484 *et seq.,* 91 S.Ct. 2022, 29 L.Ed.2d 564, (1971).

### III. Motion to Discharge

The defendant and DiFonzo moved to be discharged from custody on the grounds that the district court had no jurisdiction over them because they had been illegally brought to the United States from Grand Cayman Island. The district court denied this motion, and defendant argues that this was error.

■ It has long been held that due process has been satisfied when a person is apprised of the charges against him and is given a fair trial. The power of a court to try a person is not affected by the impropriety of the method used to bring the defendant under the jurisdiction of the court. *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). Once the defendant is before the court, the court will not inquire into the circumstances surrounding his presence there. *United States ex rel. Calhoun v. Twomey,* 454 F.2d 326, 328 (7th Cir. 1971). The Supreme Court recently reaffirmed the continuing validity of the *Ker-Frisbie* doctrine. *Gernstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865–6, 43 L.Ed.2d 54, 68 (1975).

We are aware of only one case in which a court departed from this doctrine. In *Unit-*

ed States v. Toscanino, 500 F.2d 267 (2d Cir. 1974), the Second Circuit remanded the case for an evidentiary hearing to determine the truth or falsity of defendant's allegations that he was forcibly abducted by or at the direction of United States officials. Toscanino had allegedly been subject to brutal torture before being returned to the United States, and United States officials allegedly had taken part in the interrogation and torture. The Second Circuit has since made clear that *Toscanino* should not be read as abolishing the *Ker-Frisbie* doctrine in that circuit and that it will only apply *Toscanino* where it is shown that Government agents took part in outrageous conduct which shocks the conscience of that court. *United States ex rel. Lujan v. Gengler,* 510 F.2d 62 (2d Cir. 1975), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668; *United States v. Lira,* 515 F.2d 68 (2d Cir. 1975), *cert. denied,* 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1976). *See Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

In part II of this opinion we held that the United States agents did not significantly participate in events on Grand Cayman Island. No facts have been alleged or proved which could be termed shocking to the conscience. *Toscanino* is therefore inapposite. We need not decide whether we would follow *Toscanino* if similar facts were presented. We note that the Fifth Circuit appears to have rejected *Toscanino,* and the Ninth and Tenth Circuits have rejected similar arguments. *United States v. Winter,* 509 F.2d 975, 987 (5th Cir. 1975), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1976); *United States v. Herrera,* 504 F.2d 859 (5th Cir. 1974); *United States v. Cotten,* 471 F.2d 744, 747–49 (9th Cir. 1973), *cert. denied,* 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396; *Hobson v. Crouse,* 332 F.2d 561 (10th Cir. 1964). None of these cases, however, appear to have involved as outrageous conduct as was involved in *Toscanino.*

## IV. A Single Offense or Multiple Offenses

### A. *Counts Two through Seven*

 Defendant was charged under 18 U.S.C. § 2113(b) with taking money belonging to six different federally insured banks. A separate count was charged for each bank whose money was taken.[8] Defendant argues that it was error to charge multiple counts since all the money taken was from the Purolator vault. In issue is what Congress intended to be the allowable unit of prosecution under section 2113(b). It is now clear beyond question that the different subsections of 2113 do not create different crimes but merely prescribe alternate sentences for the same crime depending on the manner in which the crime was committed. *Wright v. United States,* 519 F.2d 13, 15 (7th Cir. 1975), *cert. denied,* 423 U.S. 932, 96 S.Ct. 285, 46 L.Ed.2d 262. Defendant was only charged with offenses under one subsection, section 2113(b).

 Robberies of multiple tellers within a bank are not separate takings within the meaning of the statute. *United States v. Fleming,* 504 F.2d 1045 (7th Cir. 1974); *United States v. Canty,* 152 U.S.App.D.C. 103, 469 F.2d 114 (1972). Nevertheless, the rationale of *Fleming* and *Canty,* which we reaffirm, leads us to conclude that the indictment properly charged multiple offenses.

 A single occurrence may constitute multiple offenses if Congress so intends. *Ebeling v. Morgan,* 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915), cutting multiple mail bags taken from the same railroad car; *Barringer v. United States,* 130 U.S.App.D.C. 186, 399 F.2d 557 (1968), *cert. denied,* 393 U.S. 1057, 89 S.Ct. 697, 21 L.Ed.2d 698 (1969), robbery of two persons at the same time. In *Fleming* this court stated:

8. A factual issue at trial was whether the takings charged in counts two, three, and four were of money belonging to the named banks or of money belonging to others. This issue was not raised in the briefs filed with this court but was discussed at oral agreement. Though

we might properly consider the issue waived because it was not raised in the briefs, we have examined the record on this point and find that sufficient evidence was presented to the jury for it to conclude the money belonged to the banks.

The crime is bank robbery, not personal assault. . . . Congress' concern was penalizing the robbery of the institution, perpetrated by whatever means, and not penalizing the robbery of each individual teller. 504 F.2d at 1054. See *United States v. Canty, supra,* 469 F.2d at 126. In this case the money taken belonged to multiple banks. That the money was all taken from Purolator's vault is irrelevant. Congress was concerned with protecting bank money. A separate crime may be charged for each institution whose money is taken. Since the money at Purolator was kept segregated in separate containers, there was no question as to whose money was taken and whose money was left as there would have been if the money had been commingled.

### B. *Count Twelve*

Defendant argues that he could not properly be convicted of taking property under section 2113(b) and transportation under section 2314. In *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court stated the standard by which to determine whether one offense or multiple offenses resulted from particular conduct:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Id.* at 304, 52 S.Ct. at 182, 76 L.Ed. at 309.

■ The relevant elements of section 2113(b) are the taking and carrying away with the intent to steal more than $100 which belongs to a federally insured bank. The relevant elements of section 2314 are the transportation of $5000 or more in interstate or foreign commerce knowing it to have been stolen. Section 2113(b) thus requires a taking, but section 2314 does not. Section 2314 requires transportation in commerce, but section 2113(b) does not. Under the *Blockburger* test, therefore, conduct even though violating both sections consti-

tutes two offenses since each requires proof of a fact which the other does not.

This holding does not conflict with *Heflin v. United States,* 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959), or *Milanovich v. United States,* 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961), relied on by defendant. In *Heflin* the Court held that in enacting section 2113(c), Congress did not intend to increase the punishment for the robber of a bank but rather intended to provide punishment for those who receive loot from a robber. Section 2314 does not refer to receiving. The primary purpose of section 2314, as indicated in *United States v. Sheridan,* 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946), would be thwarted if we were to engraft a receiving requirement on to it. In *Sheridan* the Court stated that the purpose of a predecessor of section 2314 was to aid the states in punishing criminals whose offenses were complete under state law but who utilized channels of interstate commerce to escape. Thus a second actor cannot be required to violate section 2314. *Milanovich* also involved statutes prohibiting taking and receiving.

■ Defendant relies on *Sheridan* in arguing that section 2314 is directed only at violators of state law who transport goods in interstate commerce, not violators of federal law. The Court in *Sheridan* did not purport to be indicating the exclusive purpose of the statute. It indicated the purpose of the statute to answer a defendant's argument that he could not be held liable under it because the fraud he allegedly committed was complete at the time the transportation occurred. The language of the statute does not limit its scope to violators of state law.

We therefore conclude that the defendant may simultaneously be convicted of violating sections 2314 and 2113(b) as charged.

### V. Jury Instructions

### A. *Credibility of an Accomplice*

■ The district court gave the following instruction on the credibility of accomplices:

An accomplice is one who voluntarily participates in the commission or the planning of a crime.

If the jury believes that the witness Peter Gushi directly participated as an accomplice in the commission of the offense charged, then his testimony should be closely examined and weighed with great care.

If the jury believes the testimony of an accomplice to be true beyond a reasonable doubt, that testimony *may be* sufficient to convict the defendant, even though it is not corroborated by any other evidence.

With the exception of a change of the word "is" to the words "may be" (italicized above), this is the standard LaBuy instruction on accomplices. LaBuy, *Manual on Jury Instructions,* 33 F.R.D. 523, 577 (1963). Defendant argues that the jury should have been instructed that the testimony of an accomplice witness should be received with great caution and scrutinized with great care.

This court recently held that the trial judge has discretion to formulate the exact language by which to convey to the jury the thought that accomplice testimony must be received with great caution. *United States v. Rajewski,* 526 F.2d 149, 161 (7th Cir. 1975). The words "suspicion" and "caution" were used in *Rajewski;* but on the facts of this case, we find no error.

In the conference on jury instructions, defendant's counsel sought to have the trial court call Gushi "a person who admitted his participation in the crime" rather than an accomplice." The instruction he submitted contained the caution language quoted above, but this was not the basis on which he argued to the trial judge that his instruction was preferable to the Government's.

In *United States v. Belcher,* 448 F.2d 494 (7th Cir. 1971), this court faced almost the identical argument to the one presented in this appeal. In *Belcher* the defendant requested an instruction similar to the one sought by the defendant in this case. This court held that it was not error for the court to use an instruction similar to the

LaBuy instruction when the lower court's attention had not been directed to the particular difference in language between the requested instruction and the one given. *Belcher* controls our decision in this case.

Defendant argues that the last sentence of the instruction given improperly advised the jury that it could convict on the accomplice's testimony alone. Gushi did not testify as to all the elements of the crimes charged; but in context of the complete instructions, we cannot conceive that the jury could have understood the instruction other than to indicate that if the jury believed Gushi on the points to which he testified, his testimony might be sufficient on those points. To so charge was not error.

■ Finally, defendant argues that since the purpose of the instruction was to protect the defendant, he had a right to have no instruction given on the subject. He analogizes to cases holding that unless a defendant requests an instruction indicating that the jury should not consider defendant's failure to take the stand or indicating that the jury should limit its consideration of defendant's prior convictions to credibility, it is error so to instruct. *United States v. Glazer,* 110 F.Supp. 558, 563 (E.D. Mo.1952); *Illinois v. Gibson,* 133 Ill.App.2d 722, 272 N.E.2d 274, 277 (1971). Defendant did not make this argument to the trial court. Instructions on prior convictions and a defendant's failure to take the stand have the potential of prejudicing him by singling out sensitive evidence. The instruction given in this case is much less likely to prejudice defendant. We hold that it is not error for a trial judge to give an accomplice instruction without a request by a defendant at least where, as in this case, the defendant does not make known his preference that no instruction be given.

## B. *Jurisdiction*

■ Concerning counts two through seven, the trial judge instructed the jury:

To convict a defendant of this count, you must find beyond a reasonable doubt:

On or about October 20, 1974, the defendant did take and carry away, with

intent to steal or purloin, any amount of money in excess of $100.00 that belonged to or was in the care, control or management of the . . . Bank . . . [named in that count];

And, that the . . . Bank . . [named in that count] was a bank whose deposits were then and there insured by the Federal Deposit Insurance Corporation.

In the indictment it was charged that the defendants took money belonging to and in the care, control and management of the various banks from Purolator, an agent of the various banks. The defendant argues:

Conspicuously absent was any reference in these elements instructions to Purolator's role as alleged agent of each of the banks [footnote omitted] . . . the jury was *not* charged with the responsibility of making the necessary factual determination, from the disputed evidence in the case, whether or not, as to each of the counts in the 2 through 7 group, theft from Purolator amounted to theft from the bank so as to confer federal jurisdiction over what otherwise would have been purely a state crime. (Emphasis in original.)

This argument is without merit. The heart of the crime charged and the federal jurisdictional nexus was the taking of money belonging to or in the control of a federally insured bank. 18 U.S.C. § 2113(b). Purolator's status as an agent, independent contractor, or otherwise was totally irrelevant to the crime charged. Under the court's instructions the jury must have found that federally insured bank money was taken. This is all that was necessary to convict under the statute. The agency language in the indictment is surplusage though there can be no doubt from the evidence in the case that the jury found the money was taken from Purolator. We note that the indictment was read to the jury as part of the instructions. Additional instructions would have been required had count nine not been dropped before trial because to convict under that count, the jury would have had to find that Purolator was in part a bank. We express no opinion on the legal sufficiency of that theory.

## VI. Purolator as a Branch Bank

The defendant argues that Purolator, under the Government's theory, constituted a "branch bank" of each of the banks named in Counts 2 through 7; that branch banking is against Illinois law and public policy; and that comity requires that the special federal protection afforded federally insured banks, *i. e.,* making thefts therefrom federal crimes, be withheld.

This argument is completely frivolous. For the counts tried it was not the Government's legal theory that Purolator was a branch bank. Purolator's legal status was irrelevant. Second, there is no evidence here sufficient for us to find that Purolator was a branch bank. Finally, acceptance of the defendant's argument would require acceptance of an unstated premise that branch banking is a greater public policy evil under Illinois law than bank theft. We do not so find.

## VII. Disparity of Sentence

Defendant argues that the sole conceivable reason defendant received a greater sentence than his codefendants who pled guilty was that he chose to stand trial. Defendant was sentenced to five years on count one, ten years on each of counts two through seven and twelve. The sentences on counts one through seven are concurrent with each other, but the sentence on count twelve is consecutive with the other sentences. William Marzano was sentenced to five years on count one, seven years on counts two through seven and five years on count twelve, all sentences to run concurrently. This court has held that disparity between a sentence given a defendant who pleads guilty and to another who is convicted after trial is not, standing alone, enough to establish that the latter was punished for exercising his constitutional right to stand trial. *United States v. Wilson,* 506 F.2d 1252, 1259 (7th Cir. 1974). No more than sentence disparity is shown in this case. In

addition there was evidence from which the district judge could have inferred that the defendant was the organizer of the scheme. Also, William Marzano executed a power of attorney to a Chicago attorney covering money stolen from the premises of Purolator deposited in banks on Grand Cayman. Gushi, of course, testified for the Government. The district court did not abuse its discretion by imposing a harsher sentence on defendant.

## VIII. Conclusion

We have considered the other contentions of the defendant and find them without merit. The conviction of the defendant, for the reasons hereinbefore set out, is

AFFIRMED.

SWYGERT, Circuit Judge (dissenting).

Defendant Marzano's conviction should be reversed and the case remanded to the district court for a new trial because Marzano's Fourth Amendment rights were violated by the illegal seizure from him of evidence while he was on Grand Cayman Island. Since the circumstances of the seizure are highly significant, they must be stated fully.

On October 30, 1974 Federal Bureau of Investigation Agents Francis J. Pieroni and Patrick Farrell flew to Grand Cayman and were met at the airport on prearrangement by Derrick S. Tricker, Superintendent in charge of the Criminal Investigation Branch of the Grand Cayman Island police force. The agents told Tricker that DiFonzo and Marzano were fugitives from justice in a four million dollar Chicago bank burglary. Tricker was told that the agents' purpose was "to establish liaison with the police over there [Cayman Island] to investigate a case" arising in the United States. No warrants had been issued up to that time for the arrest of either defendant. The FBI agents furnished Tricker with photographs of the defendants and said they wanted him to find "these two fellows." [1]

Initially the agents accompanied Tricker to the Grand Cayman immigration office. There they were told that on October 22 a private plane had arrived on the island. The immigration officer identified the photograph of DiFonzo and informed the officers that when a large piece of luggage opened on the customs' counter "it was crammed with U.S. dollar bills which were bound up."

After the visit to the immigration office, Tricker, accompanied by the agents, visited six hotels on Grand Cayman Island in search of DiFonzo and Marzano. Tricker testified that on the second visit to the Holiday Inn he found the parties he "was looking for" registered under assumed names. At about 9:30 that evening Tricker

---

1. Tricker testified:

Q. You were asked for assistance by the Federal Bureau of Investigation?
A. I was.
Q. The assistance was to find Pasquale Marzano and Luigi M. Di Fonzo; isn't that right?
A. That is correct, sir.

\*　\*　\*　\*　\*　\*

Q. Now directing your attention to October 30, had you previous knowledge that two officers of the FBI were going to come to Grand Cayman?
A. I received a telephone call about an hour before their arrival from Miami saying two officers were going to arrive on the island.
Q. That phone call was from the FBI in Miami?
A. That is correct.
Q. Did they tell you anything other than two agents were going to arrive on a plane in Grand Cayman?

A. Because of the insecurity—
Mr. Troy: I object.
The Court: He may answer.
By The Witness:
A. They told me the officers would tell me what it was about when they arrived.

\*　\*　\*　\*　\*　\*

Q. Now when they arrived, what was the conversation which you had with them?

\*　\*　\*　\*　\*　\*

A. They told me that they had grounds to believe that two persons, or possibly three, that had been involved in a burglary involving over four million dollars had come to the island.
By Mr. Breen:
Q. Did they have any photographs with them?
A. They had photographs of two persons who they said were Marzano and Di Fonzo, Luigi Di Fonzo and Charles Marzano.

accompanied by agent Pieroni went to the island airport.[2] At about 10:00 P.M. Tricker said he saw DiFonzo and Marzano at a departure gate and, after identifying himself, asked them to "give me their names and addresses and to identify themselves." He then asked the two men to accompany him to a room in the airport. Tricker told them that they were then under arrest for "refusing to give their names and addresses." Agent Pieroni was present in the room at the time. DiFonzo and Marzano were never formally charged with refusal to give their names. At the time of their arrest, each had a ticket for an air trip to Costa Rica in the name of "Stewart."

DiFonzo and Marzano were taken into custody and driven to the police station in a police car accompanied by Tricker and

Agent Pieroni. There they were searched in Tricker's office by Detective Inspector Evans of the Grand Cayman police. Tricker and the two FBI agents were present during the search. (Agent Pieroni specifically requested to be present.) "Everything they had on them was taken," according to Tricker. This included $9,300 which Marzano had in his pocket, $13,000 which DiFonzo had in a briefcase, a piece of paper "with something written on it," and two air tickets in the name of Stewart.[3] The agents looked at the items and helped inventory them.

DiFonzo and Marzano were placed in a police lockup overnight and the next morning Tricker took them to the airport and put them on an airplane bound for Miami. Agent Farrell rode in one car with Marzano

2. Earlier in the evening, Agent Pieroni had dinner with Superintendent Tricker and his wife. The agent testified as follows:

Q. During the course of that dinner, there was some conversation relative to checking the planes that leave Grand Cayman Island?
A. Yes.
Q. And that, "We will check all of the planes, because we might catch them leaving."
A. That was Mr. Tricker's idea, yes.
Q. Right. You went with him?
A. I was with him.
Q. And went with him?
A. And went with him.
Q. From the place where you dined to the airport, some how many miles away?
A. I have no idea, three or four miles.
Q. Now you weren't there as a private citizen. You were there as an agent of the Federal Bureau of Investigation?
A. That is right.
Q. Then, of course, you were present at the time Tricker arrested the two accused?
A. I was in the airport terminal, yes.
Q. You could hear what he said to them?
A. I did not.
Q. You did not?
A. I was 50 feet from him.
Q. Fifty feet?
A. Yes, sir. He approached them alone.

3. Tricker testified:
A. They were searched in my office, I said.
Q. By whom?
A. By Detective Inspector Evans.
Q. Evans?
A. In my presence.
Q. What did he take from them?
A. Everything they had on them, as we do all prisoners.
Q. Well, what was that?

A. I didn't list the property, but I think Marzano had something like $9,300 on him. Di Fonzo had something like $13,000, a briefcase, two air tickets in the name of Stewart, a piece of paper with something written on it, five cases—
Q. What was written on it?
A. I can't recollect now.
Q. Do you have it here?
A. I haven't, no.
Q. Did you give it to the U.S. Attorney?
A. Not the U.S. Attorney. I gave it to the FBI.
Q. Who?
A. We put them back in the luggage.
Q. Who did you give them to in the FBI?
A. We put it back in their luggage and the luggage was put on the plane for them. What happened to it after that, I don't know.

＊　＊　＊　＊　＊　＊

Q. What happened to the money?
A. That was handed to Special Agent Farrell.
Q. Because he was going back on the same plane?
A. If we had lost $23,000, because I sent it through the normal fashion in the hold of the aircraft, I might have been held responsible.
Q. You never considered giving it back to the people you took it from, did you?
A. No, because I had reason to believe—
Q. No, no, please. You did not consider giving it back to them. Yes or no?
A. I am telling you why I did not do it.
Q. No, please be responsive to my question.
A. I did not consider giving it back to them.
Q. So you gave it [to] an FBI man—
A. That is correct.

278

and two officers of the island police. Agent Pieroni rode in a car with Tricker and DiFonzo. The items inventoried during the search, including the $23,000, were handed to agent Farrell and the defendants' baggage were placed on the plane by the police. The FBI agents supplied and paid for the plane tickets to Miami for DiFonzo and Marzano and sat next to them in the plane during the trip. A Grand Cayman police officer also accompanied the defendants on the trip to Miami. His fare was paid by the FBI.[4]

Sometime on October 31, after the arrest and search, the FBI learned that warrants had been issued for the arrest of DiFonzo and Marzano in the United States. This information was passed on to Tricker.

4. Agent Pieroni testified:

Q. Now, look, you did not say to Tricker, did you, "I would like to get these guys off the island. Will you help me?"
A. I did not.
Q. You did not say, "Send them to the United States so I can arrest them"?
A. No, sir.
Q. Did you know that they had a ticket for Costa Rica in their pockets?
A. Yes.
Q. You supplied the tickets for Miami, didn't you?
A. Yes, I did.
Q. Did you pay for the Caymanian police to accompany him to the plane and to the United States?
A. Yes, sir.
Q. You did not give any indication to Tricker at all that you wanted them back in the States?
A. No, I didn't.
Q. You did not ask the defendants if they wanted to go to Miami, did you?
A. No, sir.
Q. Did you ask them if they wanted to go to Costa Rica when they had their tickets and their baggage was on the plane?
A. I had no conversation with these gentlemen, except for the coffee and sandwiches episode.
Q. Now you took $26,000 from Mr. Tricker, didn't you?
A. No, I didn't.
Q. The fellow with you?
A. Yes.
Q. In any event, you took that, along with personal papers, in a valise, right?
A. Yes, Agent Farrell did.
Q. Do you still have those in your custody?
A. Do I still? I don't know.
Agent Farrell testified:
Q. Now did you see two tickets for Costa Rica in the personal belongings of the accused?
A. In the personal belongings of the accused?
Q. Yes.
A. No. Two tickets of that description were given to me by Superintendent Tricker.
Q. By who, Tricker?
A. Yes, sir.
Q. That was before the tickets for Miami were purchased?
A. I presume so, yes, sir.

Q. What time of the day or night did you know that they were returning to Miami?
A. It was on the 31st day at breakfast, about 8:15.
* * * * * *
Q. All right. Did you take charge of the baggage or did you give it to Gerrity?
A. At what point? When we arrived in Miami?
Q. Yes.
A. No, I just kept charge of a small attache case. The rest was picked up by other agents from the plane.
Q. You rode in which car on the way to the airport, by the way, with the Caymanians and the defendants?
A. Mr. Marzano and two officers of the Cayman police.
Q. He was under arrest?
A. Who was under arrest, Mr. Marzano?
Q. Yes.
A. He was under arrest the previous evening. At least, that is what Mr. Tricker told me. I do not know what his status was the next day.
* * * * * *
Q. Would you have let them get out and leave, if they would?
* * * * * *
A. I would have no jurisdiction to prevent him from leaving.
By Mr. Troy:
Q. You would have let him leave?
A. He is bigger than I am.
Q. Were you present when there was some conversation about where the defendants were going from the police station?
A. At what time?
Q. Do you remember any conversation relative to their going to court rather than to the airport?
A. No, sir.
Q. You don't.
As soon as they stepped off the plane in Miami, they were handcuffed, right?
A. I don't recall whether it was as soon as. I was not a part of the—
Q. Did you let them get up and move about in the plane?
A. I did not prevent him. I did not allow him.

Upon arrival in Miami the two were immediately rearrested, this time by federal agents. The items seized in the search were handed by Agent Farrell to the FBI "case" agent, Richard Gerrity, in Miami. The money was counted by the two agents. The inventory list of the items seized was furnished to the United States Attorney in Chicago. The items in question were the subject of the motion to suppress. At trial they were admitted into evidence. In ruling on the motion to suppress the trial judge made the following findings:

> There appears to be no serious dispute as to facts surrounding the defendants' return to the United States. In no way did the United States Government illegally or forcibly abduct the defendants from the British West Indies. In fact, the evidence is manifestly clear that the Federal Bureau of Investigation played little or no part in the return of the defendants to the United States. A review of the evidence indicates that the defendants' return to the United States resulted principally from the efforts of one Grand Cayman police officer, Detective Superintendent Derrick Tricker.

> In summary, Supt. Tricker testified that he was aware of the fact that the defendants were present on the Island and had in their possession a large quantity of American currency. When contacted by the F.B.I. he agreed to meet two agents of the Bureau who were attempting to locate the defendants. However, Supt. Tricker admonished the agents upon arriving on the Island that they could not carry weapons (prohibited under Island law) nor could they interrogate or take into custody the defendants. As he testified 'I informed them that they had no jurisdiction but allowed them to accompany me in my investigation.' At the hearing the F.B.I. agents totally corroborated Supt. Tricker's testimony.

The agents did not take the defendants into custody nor even speak to the defendants about the crime committed and the ensuing investigation by American authorities. No evidence to the contrary was offered.

On the morning of October 31 Supt. Tricker asked the defendants to board a plane bound for Miami. He had previously taken defendants into custody for various infractions of Grand Cayman law. At no time did the defendants resist boarding the flight for Miami. On no occasion did agents of the F.B.I. actively involve themselves in the process whereby the defendants returned to the United States. Even if the F.B.I. agents had wanted to arrest, illegally kidnap, or forcibly abduct the defendants, it was clear that Supt. Tricker would not permit such actions since the American agents were without any form of authority or jurisdiction on the Island. Indeed, as Supt. Tricker made imminently clear by his testimony, he was responsible for defendants' return to the United States, not the F.B.I. agents. The agents throughout the time in question were mere observers.

The trial judge clearly erred in finding that the FBI "played little or no part in the return of the defendants to the United States, . . . that on no occasion did agents of the F.B.I. actively involve themselves in the process whereby the defendants returned to the United States, [and] . . . . The agents throughout the time in question were mere observers." Rather, the evidence is manifestly clear that the agents were not mere observers. They actively instigated the search for DiFonzo and Marzano on the island, and they participated, in any real sense of that term, in the search for the defendants, their arrest, the search and seizure, and in their return to the United States.[5]

The defendant is correct in arguing:

> I pointed out to them informing them of their rights under American laws on the island had no bearing on the case whatsoever. Agent Pieroni testified on the same subject:
> A. Yes. When Farrell arrived, he asked me if Mr. Tricker had advised them of their rights.

---

5. Tricker testified:
 A. Five minutes later, Special Agent Farrell arrived. At no time did either of these agents say anything. They seemed extremely worried. Special Agent Farrell said to Special Agent Pieroni, "Should I inform them of their rights?"

But for the instigation of the FBI, defendant would never have been arrested and searched on Grand Cayman Island.

But for the aid of the FBI in supplying Tricker with defendant's photograph, no arrest could have been made.

But for the presence of the FBI and information supplied by the FBI, the local authorities would not have seized defendant's property (including money, plane ticket, personal papers) and refused to return it to defendant.

A reading of the testimony of Superintendent Tricker and Agents Pieroni and Farrell leaves the indelible impression that these three at the hearing made a deliberate, studied effort to place the responsibility on Tricker for the arrest, the search and seizure, and the return of the defendants and to disassociate the FBI agents from the adventure.[6] The stark facts show otherwise.

Mr. Tricker heard this and responded that it was the Cayman Islands. He had cautioned them under his own law and that the American advice-of-rights method does not apply there.

6. Some of the excerpts from the record are instructive. Tricker testified:

A. I took them to the local airport to put them on an airplane.

Q. Accompanied by the FBI?

A. They were catching the same flight.

Agent Pieroni testified:

Q. How many phone calls to your superiors did you make while you were down there?

Mr. Breen: Which time?

Mr. Troy: The first time.

By The Witness:

A. The first time? I don't know.

By Mr. Troy:

Q. More than one?

A. Yes.

Q. Did you call the office every day?

A. Yes.

Q. Did they give you instructions as to how to proceed?

A. No.

Q. Did you tell them how it was proceeding?

A. Yes.

Q. Did you tell them that there was a joint Caymanian-Bureau effort to find the defendants?

A. Excuse me, a joint what?

Q. Caymanian-Bureau effort to find the defendants?

A. I told them what information had been developed down there since we were there, through Mr. Tricker. I kept them informed, yes.

\* \* \* \* \* \*

Q. All right. Did you suggest to Tricker at that time or at any time subsequent to that, prior to the defendants leaving the island, that you would like to get them back to the United States?

A. That I would like to get them back to the United States?

A. That I would like to get them back?

Q. Yes.

A. No, sir.

Q. Tricker just came to you and said, "I am going to put them on the next plane to Miami"?

A. Yes, he did.

Q. You had no conversation, or anybody else in your company, had no conversation with Tricker relative to doing the same?

\* \* \* \* \* \*

Q. Did you advise him of information that you had about Luigi Di Fonzo and Pasquale Charles Marzano?

A. Yes.

Q. What did you tell him?

A. I first gave him the general facts surrounding the theft and I furnished him with the names of Charles Marzano, Anthony Marzano, Luigi Di Fonzo, their descriptions and photographs.

Q. Did he give you any information with respect to your position on the island?

A. Yes. He told us at the outset that we were not to interview anyone without him being present and that he would conduct any interview, even when he was present and that we had no official authority on the island.

Agent Farrell testified:

Q. Let me ask you this: You were present during the search, when Tricker made the search or whoever made the search?

A. It was two other officers that conducted the inventory or search or whatever it was.

Q. You were there?

A. That is correct.

Q. Did you go through any of the personal papers of the accused?

A. No, sir.

Q. You did not touch a thing.

A. Not to my recollection, unless I stepped over the luggage or something.

Q. Did you open the luggage?

A. I did not, no.

Q. Did you thumb through the things in the luggage a little?

A. No.

Q. Did you take the numbers of the money, maybe?

A. No, sir.

Q. You did not look the money over at all?

A. I saw it.

Q. Didn't you look through it to see if it said Purolator on it or anything?

A. No, I did not.

Q. All right. Now you never participated in the search whatsoever; is that right?

The majority discusses a number of precedents to draw subtle distinctions as to when official involvement is or is not sufficient to invoke Fourth Amendment protection. But the law is not cloudy when the involvement is as clear as it is in this case. In *Reid v. Covert*, 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148, 1157 (1956), the Supreme Court, speaking through Mr. Justice Black, delineated the basic reach of the Bill of Rights with respect to citizens of the United States when abroad. There Mr. Justice Black wrote:

> At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.

The majority of the panel in this case allows foreign officials to hand evidence against the defendants to federal agents on a "silver platter." The cases dealing with this doctrine decided prior to the Supreme Court's decision in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), which excluded evidence seized illegally by state officials and handed on a "silver platter" to federal officers, do present situations analogous to that before us. Those cases clearly indicate that the evidence seized in this case should be suppressed.

The Fourth Amendment does not, of course, apply to foreign officials and evidence obtained in violation of that amendment by such officials. If the "silver platter" cases are followed, the evidence would be admissible in a federal court *unless* the purpose of the illegal search was to obtain evidence of a federal offense, *Gambino v. United States*, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927), or *unless* federal officials participated in the search, *Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927). If the federal officials "had a hand" in the search, "before the object of the search was completely accomplished," it becomes a joint operation, and the "[federal official] must be deemed to have participated in it." This was the holding in *Lustig* and is the law that must be applied to the facts of this case. When so applied there can be but one answer. The FBI actively participated in the illegal search and seizure. Accordingly, the motion to suppress should have been granted.

A. That is correct, sir.

Q. All right. Now you never asked any questions?

A. Not in reference to the search.

Q. You did not ask any questions of the accused either?

A. That is correct.

Q. No interrogation?

A. I asked whether they would like cream in their coffee.

Q. But no interrogation?

A. No interrogation.